# THE EL DORADO.

## JOHNSON et al. v. THE EL DORADO.

*(District Court, S. D. Florida.* April 23, 1892.)

1. SALVORS—WHO ARE—ADDITIONAL ASSISTANCE.
    The steamship E., of 2,500 tons, bound from New York to New Orleans, with a valuable cargo, struck a rock on the Bahama banks, partly filled, and was soon after grounded near Bimini, in 32 feet of water. The wrecking schooner C., of 80 tons, with proper pumps and appliances and 22 men, went to her assistance from Key West, accompanied by a revenue cutter. A diver with a diving suit worked continuously in stopping the leak, while the rest of the crew were engaged in removing submerged cargo in order to get the suction pipes into the hold, the cargo being placed on the C. After five days' work other wrecking vessels arrived from New York. The following night the C.'s rudder was carried away in a squall, and as she was then heavily laden, and as the revenue cutter, which was about to leave, offered to tow her to Key West, her master decided to go that day, against the objection of the master and agent of the E., who desired the saved cargo to be transferred to one of the New York vessels, and offered to guaranty the owners of the C. against her loss. An additional reason for desiring the protection of the revenue cutter was that there had been threats of seizure for wrecking in what were claimed to be British waters. The C. left with the E. her pumps and most of her crew. The E. was finally floated, taken to Newport News, and there libeled by the owners and crew of the C., who also brought this libel against the cargo carried to Key West. *Held*, that libelants were original salvors, notwithstanding that the services of the vessels from New York were finally efficacious in saving the vessel and most of the cargo.

**2. SAME—MISCONDUCT OF SALVORS.**

Under the circumstances it was not improper to carry the saved cargo to Key West, as it was not improbable that the E. and the rest of her cargo would be entirely lost, and as there was no offer to guaranty the salvage, especially in view of the needed protection of the revenue cutter.

**3. SAME—COMPENSATION.**

Salvage could only be awarded with respect to the cargo brought to Key West, and the fact that, while engaged in saving it, the salvors were also rendering valuable services to the steamer and the rest of the cargo, for which proper compensation would presumably be awarded in the proceeding against them, taken together with the fact that the vessel was finally saved, are reasons which should operate to reduce the salvage below the usual percentage allowed in the district for diving up cargo; and therefore 25 per cent. should be considered a proper allowance.

**4. SAME—VALUE OF RES—STIPULATION.**

Where the claimant, in order to get possession of the cargo after the filing of the libel, stipulated with libelants that its value should be considered as $18,000, he was estopped from afterwards disputing this amount, or proving that the cargo sold for less after transportation to New York; but as the stipulation was in place of an appraisement, and as it is the practice of the district to deduct from the appraised value all charges and expenses incident to the custody of the property, such deductions should be allowed from the stipulated value.

In Admiralty. Libel by B. W. Johnson and others against a portion of the cargo of the steamer El Dorado. Decree for libelants.

*Jeff. B. Browne*, for libelants.

*G. Bowne Patterson*, for claimants.

LOCKE, District Judge. This steamship, of about 2,500 tons net tonnage, laden with a valuable cargo, bound from New York to New Orleans, struck an unknown and uncharted rock not far from the Great Isaacs, on the Bahama banks, on the night of the 4th of August, 1891. She was soon found to be leaking badly, and was run ashore on a sandy bottom not far from Bimini. The leak was in one of the forward compartments, so that she had settled very much by the head, her bows resting for about 30 feet on the sandy bottom in 32 feet of water, while the rest of her length was afloat, drawing at her stern but about 18 feet; but she was water-logged, and had a heavy list to port. While in this condition the wreckers from Bimini and the other Bahama islands came on board, and were permitted to discharge cargo from between decks and take it ashore; but they had no appliances for stopping leaks or relieving the vessel in any other way, and the master, employing one of the Bahama boats, sent his first officer to Key West for aid. Mr. Philbrick, the agent of the owners of the steamship line, made application to the libelants owner and master of the wrecking schooner Cora for assistance. She was a licensed wrecker, a schooner of about 80 tons, fitted up with four steam pumps and boiler, a diving suit and apparatus, an experienced diver, anchors, hawsers, and other wrecking appliances, and was used only for salvage purposes, but was then lying with a ship keeper and master on board.

In a short time they had selected from the experienced Key West wreckers and naked divers a crew of 22 men; and signified their willingness to proceed to the stranded ship, but suggested that, as the Cora was a sailing vessel, it would save much time if the services of the revenue

cutter McLain could be procured; she being the only steam vessel in the harbor. Both the owner of the Cora and Mr. Philbrick made application to the collector of customs for the revenue cutter to take the Cora in tow, which was granted. The libelants in the Cora, in tow of the McLain, reached the El Dorado, Sunday, the 9th of August, and immediately went to work. Johnson, the principal libelant and submarine diver, went under the bottom, while the others went to work getting out and setting up the pumps. Johnson found the port side of the steamship uninjured, but on the starboard side he found extensive damage,— seams, cracks, and holes, more or less open, for the distance of about 28 feet. These he went to work repairing, and continued patching, plugging, wedging, and calking with wedges, plates, patches, and rolls of blankets: working under water more or less every day until Thursday afternoon, when, in adjusting a large canvas patch over the holes which he had stopped, he discovered another large hole further aft, which he was unable to repair that day. In the mean time the other libelants had been at work rigging up and using their four steam pumps, and breaking out and getting up the cargo from the hatches of the first and second compartments, in order to get the suction pipes down into the hold. The water came inside the hatches to the coamings, so that everything that was taken out was taken out from under water, and, after a short time, from water several feet in depth, by naked or skin divers. When the pumps first got to work they apparently lowered the water, but subsequently they found it impossible to pump the ship out until all the holes were stopped, and after working some time, concluding that there were no holes in the first compartment, but were all in the second, they removed their pumps in the first hold, and went to work in that, hoping to free that, and to float the vessel; but it was found that the doors between the two compartments were not tight, but sprung open by the pressure of the water, so they attempted to work out the cargo so as to reach and tighten them. They worked this way from early daylight until late every night, diving up, hoisting out, and putting on board the Cora the cargo from these holds, until the night of Friday, the 14th, when she was filled with all she could carry. On that day the wrecking steamer the I. J. Merritt arrived from New York with more pumps, divers, and other appliances. Libelant Johnson was nearly worn out with having been under water so much for the last five days, and the divers from the Merritt continued the work which he had commenced. The night of the 15th the vessel, being exposed to the wind by her stern being raised high in the air, was struck by a severe squall, and, although they had anchors and hawsers laid out from the mast heads, and the revenue cutter towing to keep her on an even keel, went over on her beam ends, and commenced to fill; when, in order to bring her upon an even keel, it was necessary to flood the fire room, engine room, and the holds fore and aft. Her crew left her, and most of the master's personal effects were taken off; the chief libelant and Capt. Byrne being about all that remained on board that night. The next

morning the steamship New York, of the same line, arrived from New York for the purpose of rendering such assistance as she might be able. The Cora in the mean time had carried away her rudder head in a squall, and was to some extent disabled, and was loaded with as much cargo as she could receive. The captain of the revenue cutter decided on returning to Key West, and offered to take her in tow to that port, and Williams, owner of the Cora and one of the libelants, accepted the offer. Capt. Byrne, of the El Dorado, and Mr. Morse, superintendent of the line, then on board of the New York, objected, and desired them to put the cargo from the Cora on board the New York, and remain to lighten the cargo from the El Dorado to that vessel; but Williams, fearing for the safety of his vessel in her disabled condition in event of a hurricane, which might be expected at any time at that season of the year, and desiring the protection of the revenue cutter from the fact that threats of seizing her for wrecking in what were claimed to be British waters had been made, declined to remain. An offer was made by Mr. Morse to repair the rudder head, and to insure the safety of the vessel, but libelants did not consider such guaranty would be of any validity, and they declined to accept it, and remain, without the protection of the cutter; and brought the cargo then on board to Key West, where it was delivered to Mr. Philbrick, agent for the claimant, and afterwards libeled for salvage. Ten of the wreckers, among them the chief libelant, the submarine diver, and most of the naked divers belonging to the Cora, remained on board the El Dorado, and assisted in continuing the repairing, pumping, and finally floating the ship, and taking her to Newport News, where, after efforts to come to a settlement, the ship was libeled by the libelants herein. The rest of the cargo, which has been taken out of the vessel and taken to New York, was libeled there, and these two suits are yet pending.

The only question in this case is, what salvage, if any, is due from the cargo saved and brought to Key West on the Cora? But the allegations of the pleadings and the testimony has so covered the entire service rendered the ship and cargo generally that the difficulty is to determine just where the service, benefit, and value for the general interest ceases, and that of the special interest of this cargo begins. The property was in peril from marine disaster; it was certain of total loss without some such service as was rendered. This was prompt, and, as far as time allowed, efficient, and without doubt, had the Merritt remained away another day or two at the furthest, Johnson would have been able to complete the patching of the remaining hole, and in time to have freed the ship. I am satisfied that the greater part of the repairing and stopping leaks had been done before the arrival of that steamer, and I think the libelants can be very properly considered the original salvors, with probably sufficient means to complete the service, and I cannot accept the position that the services of the steamer Merritt were alone valuable. The wrecking appliances, schooner, pumps, divers' suits, and armor had been fitted out at a good deal of expense by the chief libelants, and were

kept only for wrecking and salvage purposes. This district had long been without the modern means of saving property, and it had been frequently intimated from the bench that if more capable means were provided it would be for the interest of commerce, and frequently enable the wreckers to earn more liberal salvages, which commerce could well afford to pay; and in an opinion in the case of *The Slobodna,* 35 Fed. Rep. 537,—a case in which had the wreckers had steam pumps the ship would have been saved,—I mention with much regret that it did not appear that the modern wrecking appliances could be profitably introduced into this district on account of the extent of reef line to be watched and the character of the bottom, from which vessels required immediate relief. Since that the libelants have procured, at much expense and trouble, appliances which have done good work in saving property which would have been lost, and which, if not as complete as those of some larger wrecking companies of other districts, are certainly entitled to encouragement. It is true that neither the services rendered by the libelants nor by the steamer Merritt to the steamship El Dorado and the rest of the cargo, after her arrival, can have any weight in the question pending in this case, as the property for which salvage is claimed had been saved, dived up, and taken on board the Cora before the arrival of that vessel; but the pleadings, arguments, and evidence, attempting to show that the libelants rendered no aid to the property, appear to demand an expression of opinion upon that point.

But coming to the property libeled herein, I am satisfied that it was necessary that it should be taken out, both to lighten the ship forward, and to enable the suction pipes to be put down into the hold. It is plainly shown that, after the Cora left, more of it was taken out and taken to Nassau. The master was helpless to accomplish this by his crew, and, although the answer alleges that there were a superabundance of men and vessels of the Bahama wreckers employed by the master to lighten all the cargo of the steamship to North Bimini, yet the future history of the cargo, so lightened, as given in evidence, shows that it was finally transported to Nassau, and thence to New York, after paying a liberal salvage.

The saving and taking out of this cargo, whether considered in respect to saving it, or in respect to its connection with the saving of the vessel and the rest of the cargo, could only be performed as a salvage service and for a salvage compensation. It was not within the power of the master to procure aid to perform it in any other way, whether it went to Bimini and Nassau, and paid salvage there, or on board the Cora as a storeship. The master had put his vessel into as comparatively a safe place as possible, yet the peril was great, and the prospect of a final saving of the entire property small. A vessel situated as this one was, leaking badly, with her stem resting upon the bottom, in $6\frac{1}{2}$ fathoms of water, and her stern elevated and exposed to the force of the wind and an open sea for 12 points of the compass, at the season of the year when a West India cyclone might at any time be expected, is in such a condition as to make

a service rendered to any particle of property, either vessel or cargo, a valuable one.

But it is contended on behalf of the claimant that the bringing of the cargo to this port of Key West, and asking compensation here, was wrongful, injurious to the property, and involving the expense of freight to New York, so that the libelants have forfeited any salvage which they might have earned from it. Would the facts and circumstances under which the Cora returned to Key West with this cargo demand such severe and extreme penalty? I do not think the evidence shows bad faith sufficient to justify such decree. We can only judge of the purposes and intentions or the integrity of one's actions in the past by the then present conditions and circumstances, and not by the light of future events then unforeseen. At the time the question whether the Cora should return to Key West or not was pending the El Dorado was sunk, —lying upon the bottom, with the water coming up on the lea side for some distance over the upper deck. Capt. Byrne says in his testimony that "the prospect was that the steamer might become a total loss." The steamers New York and Merritt, as well as a number of Bahama vessels, one as large as the Cora, and an abundance of men, were present to render what aid was necessary. She took away neither her pumps, her submarine diver, nor her skin divers, nor in reality anything that could be needed in the future preservation of the property; her presence with that of the men that left in her could have rendered no further aid than did those remaining, and the fact is that she returned to the service as soon as she could be repaired.

In examining the argument made by the claimant that the cargo was taken to a port inconvenient and expensive for the owners of the property, the rights and interests of both parties, and not of the claimant only, should be considered. It is a well-established principle of salvage law that while the salvor is not justified in unnecessarily and unreasonably taking a ship or goods to a port inconvenient to the owners, (The Eleanora Charlotta, 1 Hagg. Adm. 156,) yet the master has no right to insist that the ship or property shall proceed or be taken to a distant port, inconvenient for the salvors, without first satisfying their demands, (The Houthandel, 1 Spinks, 25;) and, if the master insists, the salvors are justified in going so far as to resist his attempt, take control of the ship, and take it to a convenient port, and place it in the custody of the law, (The Nicolai Heinrich, 17 Jur. 329; 22 Eng. Law & Eq. 615; The La Bruce, [decided in this district by Judge WEBB, 1837,] 1 Adm. Rec. 84; Marv. Wreck. & Salv. 150.)

When the master and Mr. Morse offered to guaranty the safety of the Cora they made no offer to guaranty any salvage on what had been taken out, and was then in safety on board the Cora. The Cora was disabled, and unable to take care of herself in bad weather. There had been threats of seizing her. The revenue cutter, whose presence, so far, had been a protection to her, was about to leave, and was willing to tow her to Key West for repairs. In this case, under the then existing circum-

stances, which port would seem to be the most inconvenient and unreasonable, the rights of both parties considered.—taking the cargo to Key West for adjudication of salvage, or compelling libelants to surrender possession, and resort to the courts of New York for their proper compensation? The owners of the property were unknown, it had been separated from the ship by the marine disaster, and, in event of its further loss, neither owner nor master of the El Dorado could be held for salvage on it. Both claimant and underwriters had their resident agents at Key West ready to look out for and protect their interests. The destination of the vessel and of the cargo was not New York, but New Orleans, a port much nearer Key West, and it appears that it was undetermined at that time whether the ship, if saved, would continue her voyage or not. There was no certainty at the time that anything more would be saved to which the libelants could look for any salvage compensation they had earned, and they had a perfect right to look to this property itself.

They were engaged at and came from Key West to render the service, and that was the district most conveniently reached, and the nearest to which damaged cargo could be taken. Could it have been foreseen at that time that the El Dorado and cargo would be saved and taken to New York, and the libelants compelled to follow and institute suits there, without doubt they would have preferred two suits to three, and been perfectly willing that this cargo should have accompanied the other; but the delivery of this cargo in question to another steamer would have necessitated following it by the libelants with an action *in rem* into whosoever hands it came. I consider that, viewing the condition of affairs as they stood on the 16th of August, libelants were sufficiently justified in bringing the cargo of the Cora to Key West to prevent the forfeiture of any salvage they had earned in saving it. They had a lien on it which they had a right to enforce; it was in their possession, and could not be restored to the El Dorado or her master; and I do not consider that the questions, risks, and inconveniences apparently necessarily involved in delivering it to another vessel, required or demanded such action so as to entail the penalty of forfeiture for not so doing.

Determining this is deciding but one question of the case,—the right of libelants to salvage; the amount of the salvage is a more difficult and delicate one. How shall the value of the services rendered the balance of the property in taking this out be separated from the value rendered this cargo alone, and the latter only considered? In this case the merchandise was all taken from under water, rendered foul by potash and tobacco, by diving to different depths, from 5 to 10 feet. The labor was disagreeable in the extreme, and carrried on with all the energy, skill, and ability demanded. There are, though, two grounds upon which it might appear reasonable that the ordinary rates in this district given for diving up cargo from a vessel should be departed from in this case: (1) The vessel was finally saved, thereby showing that the danger to the property was not as imminent as where the vessel is lost. (2) The libelants in this case were rendering valuable aid to the vessel and rest of the cargo,

and it is presumed were earning other salvage at the same time. How far should these questions affect the salvage in this case, if at all?

This cargo, or the greater part of it, which was taken out from the square of the hatches, was not only in certain danger of total loss unless removed, but its presence and position was imperiling the entire property. It would have been utterly impossible to save the ship but by taking it out, even had it been necessary to jettison it. In the case of the British steamship *Mississippi*, on Fowey Rocks, in 1874, (10 Adm. Rep. 595,) where the cargo was taken out by diving, and the vessel afterwards saved by other salvors, as well as in the case of *The Amisia*, (1872,) Id. 249, where the circumstances were the same, I had an opportunity to carefully examine this question, and considered that, where it was absolutely necessary that the cargo should be removed for the perservation of the vessel, the property was in as great danger as where the vessel is finally lost, or, rather, the need of assistance is just as urgent. I do not consider that the fact that the vessel was finally saved in this case should have any more weight than it did in those, or in the case of the cargo that went from the ship to Nassau.

The other ground, that the libelants were earning other salvage at the same time, presents a more difficult question for consideration. A fair, reasonable, and just compensation, and an equitable bonus or gratuity, is all that can in justice be given, in any case of property saved from marine disaster; and where a service is rendered to property of a large value, a small rate per cent. will pay more generously than a larger rate upon a smaller amount. It now appears from this case as tried that a valuable service was rendered this vessel and the entire cargo, and it is to be presumed that there will be awarded a fair and just salvage for such service from such property, but how far should such presumption influence an award in this case? There is nothing in this case to inform the court of the value of the entire property, so that it could be estimated about what would be a fair rate upon it, nor can this court decide how, when those other cases come on to be tried, they may appear, or what may be the decisions of those courts. The claimant herein is contesting such claims for salvage, and by his allegations denies the value of these services, and alleges that no substantial service was rendered until the arrival of the Merritt. Had decrees been given in these pending cases, this court could very justly consider such awards in determining this case, as the courts of the other districts can properly consider any award made in this case; but, in the absence of any such decrees, I do not consider that it is equitable or just to deprive the salvors in this case of anything they have actually earned from the property libeled, in anticipation of any future decrees from another court against other property.

Considering this case, then, in relation to the property libeled only, what would be a fair and just compensation? The numerous cases cited in the case of *The Slobodna*, 35 Fed. Rep. 537, show what have been the usual rates for diving up and saving cargo in this district for many years. Taking cotton in bales as a basis, the rates have usually

been 25 per cent. on that saved dry, 40 per cent. upon that saved from water, but without diving, and 50 per cent., or sometimes even higher, for that saved by diving, according to the peculiar circumstances of the case and the depth of the water, and I have never found that such rates have compensated the salvors too generously for the time and labor and services rendered. In other cases of merchandise than cotton, the rates have, at times, varied according to the bulk, value, or character of it, sometimes being more and again being less. This merchandise was of more value than cotton, and a somewhat less rate than is usually given on that would appear to be fair, even if the libelants had no interest in the rest of the property in peril. In the case of *The Tregurno*, (recently decided in this court,) 50 Fed. Rep. 946, where a steamer was driven high onto a rocky beach, was leaking, full of water, and had to have nearly all of her cargo taken out before she could be floated, in the light of numerous cases decided in this district, and *The Sandringham*, 10 Fed. Rep. 562; *The Egypt*, 17 Fed. Rep. 359; *The Kimberley*, 40 Fed. Rep. 289; *The City of Worcester*, 42 Fed. Rep. 913; and other cases, —I considered 25 per cent. not an unreasonably large salvage upon the entire ship and cargo; and, had the libelants done nothing but save the merchandise herein libeled, the same rate given in *The Tregurno* (25 per cent.) would not be deemed unreasonable. This is less than was voluntarily paid the Bahama wreckers for similar services, and will individually give the salvors but about $80 per share, which is not deemed too large, simply as wages, when the time occupied and the character of the work is considered. On that cargo which went to Nassau there was paid from 30 to 35 per cent., and this Chief Justice YELVERTON in the case of *Braynen* v. *The El Dorado*, in the vice admiralty court at Nassau, January 28, 1892, characterizes as being "most grievously underpaid." Certainly, had this cargo gone the same way, it could have had no better fate or incurred less expense.

In order to procure possession of this property after in was libeled, a stipulation and agreement was entered into by libelants and claimant that the value of the property should be considered $18,000, and that that value should be accepted in lieu of an appraisement. The claimant in his answer now denies that the property was worth $18,000, and alleges that it was taken to New York, and there sold for less than that amount, and offers to introduce evidence of the sales, proceeds, and expenses. It has frequently been the practice of this court, when satisfied that an error has been made in the appraisement, and the property is still in its custody, even after judgment, to open the decree for a rehearing upon the value, and receive further evidence upon that point; but where parties, by agents well versed in this class of property, after a careful examination of it, agree upon, and stipulate for, a certain amount for the purpose of getting possession of it, take it beyond the knowledge or control of the court or the other party at interest, and dispose of it *ex parte*, I consider it would be a most unsafe practice to adopt to permit them to come in, and, by asking, set aside their agreement. If force

and validity is ever to be given to an agreement, it seems that it should be in this case, and I must hold that claimant is stopped from questioning the value of the property. But that stipulation is that that value shall be taken in lieu of an appraisement, and as the value of the property at that time. It has been the established practice of this district, where a percentage of value is given, to ascertain the net value by deducting from the appraisement all expenses which have been incurred in the care and custody of the property up to the time of so determining its value, and this seems but fair in this case. It is therefore ordered that there be deducted from $18,000 all of the expenses of labor, warfage, and storage, etc., incurred in the preservation of this property previous to the 31st day of August, that being the date of the agreement, together with the costs and expenses of this suit, and the libelants receive 25 per cent. of the net amount thus found, and the matter be referred to the clerk, as commissioner, to ascertain the costs, charges, and expenses, and make the computations.